(No. 7005. October 22, 1942.)

ETHEL WOODBURY, Employee, Appellant, v. FRANK B. ARATA FRUIT COMPANY, Employer, and STATE INSURANCE FUND, Surety, Respondents.

[130 Pac. (2d) 870.]

Rehearing denied November 30, 1942.

Elam & Burke and C. H. Higer for appellant.

Frank L. Benson for respondents.

BUDGE, J.—This appeal is from an order of the Industrial Accident Board denying appellant's claim for compensation. The facts are substantially as follows:

Appellant, a married woman fifty-seven years of age, was employed during the fruit season by the Frank B. Arata Fruit Company, the building being owned jointly by Frank B. Arata and John Dewey. In the early part of July, 1940, while engaged in sorting apricots, in the course of her employment, she was struck on the left breast by what is known as a facer pan, which flew off the end of an overhead track. Appellant describes the accident as follows:

"A. It [the facer pan] came off of the end of the track—all the stop that had been there was a little piece of wood, I believe from the side of a cherry crate, a very light piece, and it had been broken in two and the small piece stuck through, and the one on my side had been knocked down. They had been hollering to shove the plates harder so the buster gave it a ·tremendous shove, sent it the full length of the track and as there was only one peg it hit that and deflected it to me, from me it hit the table and on to the floor.

\* \* \* \*

"Q. When this pan struck you, did it hurt?

"A. It certainly did.

"Q. Just describe what the pain was.

"A. In plain words, it knocked the breath out of me."

On the afternoon of the same day, appellant noticed a rigidity in the breast. Shortly thereafter a yellowish-green

discoloration appeared over the place where she was struck. From the date of the accident, appellant testified, she continued to feel a sense of rigidity in the breast, and during the latter part of August she began to experience shooting pains radiating from the breast to the arm pit. With respect to claimant's injury, the board found:

"That the night after claimant was struck on the left breast as above stated, she noticed a rigidity in said breast and about one week later noticed a yellowish-green discoloration; that the breast was not overly sore, but the greenish color stayed, and the breast became more rigid; that about August 20 she felt a pulling sensation and about September 1 noticed shooting pains that went from her breast to her arm."

On the 4th day of September, 1940, she consulted Dr. R. A. Goodwin, a practicing physician and surgeon at Emmett. At the time of the doctor's first examination, there was no external evidence of cancer; there was no evidence of any swelling in the axilla or arm pit. At the time of the second examination, some two weeks later, there was still some discoloration, and also evidence of a small swelling. On subsequent visits, the doctor discovered a swelling in the arm pit, following which Dr. Goodwin performed an operation for the purpose of taking a biopsy. Upon examination of the tissue thus removed, the doctor concluded that appellant was afflicted with cancer of the breast.

Following this preliminary examination Dr. Goodwin, assisted by Dr. Carver, performed a radical breast operation, described by Dr. Goodwin as follows.:

"A. The entire breast tissue and the muscles underlying the breast tissue and all the skin over lying the breast and including other tissue about the large vessels in the arm pit and the lymph nodes in the arm pit were all removed."

Dr. Goodwin further testified that the yellowish-green discoloration which he noticed at the time of the first examination was undoubtedly caused by a direct blow or injury, and further testified that it was his positive opinion that the blow suffered by appellant aggravated and acceler‐ated an existing cancerous condition. He further testified that:

"A. It is impossible for me to say it would or would not cause a cancer. I, and I don't believe anyone knows what

causes a cancer but I believe if such a condition existed it would be aggravated by a trauma, a direct injury.

"Q. A direct injury would aggravate or accelerate such a condition?

"A. Yes."

* * * *

"Q. Your opinion is if the claimant had had a blow on the breast on the date she said she had, it would aggravate the condition of cancer? You are assuming the condition of cancer existed at that time?

"A. With your statement, I am."

* * * *

"Q. From what examination you made, isn't it your opinion that the cancer had existed for a long period of time?

"A. Would you be more definite and say how long? I can't answer unless you do.

"Q. Well, for several years, be coming on gradually?

"A. No, I would say definitely not.

"Q. For a year?

"A. I would say definitely not a year.

"Q. You say that the cancer commenced probably at the time she said she had the blow?

"A. I would say that is possible.

"Q. Do you not think it is probable?

"A. No.

"Q. It is your opinion she had a cancer there over a period of time. Is that correct?

"A. * * * * after the operation was done I thought probably the cancer had existed there for a period longer than the history of the injury. That is a possibility. I don't know how—we don't know how fast these develop. There is no way of telling."

* * * *

"Q. As to the time in which cancer develops you don't deny, do you, that cancer may develop over a period of years?

"A. It may.

"Q. As a matter of fact it ordinarily does, cancer of the breast?

"A. Ordinarily it does, although I have seen cases of cancer of the breast where the first thing you noticed was a small lump in the breast and six months later the patient would be dead."

Dr. Popma testified as follows:

"Q. I will ask if from your examination, if you could tell how long the condition had been present, or approximately?

"A. It is difficult to say how long the cancer had been there. We do know, however, that in this chronic cystic disease of the breast which was present, and that evidently has been present for a number of years. Those things do not appear in a very short period of time. The cancer, itself, had probably been present a matter of at least several months because of the fact that it was not a rapid growing tumor, and also the fact that it was commencing to spread to the axilla, or arm pit."

\* \* \* \*

"Q. In your study of cancer, is it your opinion that cancer can be caused from a single blow?

"A. I don't believe that that is very likely. It has never been my experience to see an actual case of proven cancer caused by a single blow.

"Q. What is the pathological condition that takes place where cancer is held to be due to trauma?

"A. Usually when we feel that cancer is due to trauma, the trauma has been present for a long period of time. In other words it is a mild slight trauma which is probably present every day for maybe a good many months."

\* \* \* \*

"Q. You said you didn't think the cancer would be caused by a single blow. You had reference to the manifestation of the cancer?

"A. Yes.

"Q. You wouldn't say a single blow wouldn't aggravate or accelerate a cancer?

"A. I wouldn't say that.

"Q. What is your opinion?

"A. I think a single severe blow may aggravate and sometimes may produce extension.

"Q. Of an existing condition?

"A. Yes.

"Q. Is there such a thing as having a dormant cancer, or a non-active cancer, not an active cancer—what I am trying to get at is,. might this be considered what you term pre-cancerous?

"A. That is in the tissue which has undergone certain changes. You cannot say they are cancerous and you cannot say they are not cancerous. They are right in the veins. The tissue may be present and remain in that condition for many years and often will not change at all, and then again we can follow them along and some become cancerous.

"Q. Assuming there was that condition present, would a blow or injury aggravate that condition?

\* \* \* \*

"A. Yes, I think an injury under such circumstances might push the thing over the fence and develop into malignancy."

\* \* \* \*

"Q. You stated that it was your opinion that the condition had been present for several months?

"A. Yes."

\* \* \* \*

"Q. You wouldn't say the injury she received didn't aggravate or accelerate it at all?

"A. No."

Dr. Carver testified as follows:

"Q. Would chondroma of the breast develop in a period of from the 7th of July to the 7th of October?

"A. In my opinion, no.

"Q. Is trauma a condition which causes cancer, in your opinion?

"A. We believe that it is one of the causes of cancer. I do. not know all of the causes of cancer, but it is one of the causes.

"Q. Will a cancer develop from a single blow?

"A. That, again, is very problematical and we know that continued trauma over several months does cause cancer. We are not, we have no definite proof, in fact everything generally points against single blow causing cancer in itself. \* \* \* \* My point is that it is problematical.

"Q. What is your opinion in the matter as to whether it would or not?

"A. I would hardly feel that a single blow would cause cancer. That is my feeling about the matter. That is my opinion.

"Q. * * * * Would it cause a cancer to develop—would it produce the condition that was found?

"A. I couldn't say yes or no. I would have to qualify. I would have to qualify my answer to this extent. My opinion would be, from the findings and what I saw, that it must have been there prior to three months."

* * * *

"Q. Your opinion would be that it could not have been within six months?

"A. I repeat what I said before—that type of cancer in the full flower and in the condition that it was found, it would appear to me that it would take six months or longer, or a year or even longer than that to develop."

Appellant's first assignment of error attacks the board's finding No. V, which is as follows:

"That on September 2, 1940, the claimant reported to the bookkeeper of the defendant employer that on August 26 she had been struck on the left breast as above stated, and requested the bookkeeper to make out a claim for compensation; that after consultation with her employer, the said bookkeeper and the claimant made out a claim for compensation on I.A.B. Form No. 1 and claimant caused the same to be served upon the employer and a duplicate filed with the Industrial Accident Board on the 18th day of September, 1940."

It will be observed that the board found that appellant reported the accident to her employer on September 2, 1940. It is contended by appellant that in this the board was in error and that there is no substantial and competent evidence to support the finding in this respect, contending that she reported the accident and injury to her employer several days prior to August 26, 1940, by reporting to the bookkeeper that she had been injured the early part of July, 1940.

The bookkeeper, Nellie Dewey, was asked and made answer to the following questions:

"Q. Did Mrs. Woodbury ever at any time report an accident to you?

"A. Yes, the latter part of August.

"Q. Do you remember the date?

"A. No, not the exact date.

"Q. What did she say?

"A. She said that she had been hurt in the apricots and wanted to report it, that it was bothering her, that it hadn't bothered her before prune time and that is why she didn't report it before.

"Q. And what did you do?

"A. I reported it to Mr. Arata and asked him to send me up some papers to fill out.

* * * *

"Q. I am handing you Claimant's Exhibit No. 4, I will ask you if you filled out that form?

"A. Yes.

"Q. At whose instance?

"A. Mrs. Woodbury.

"Q. I notice on there it asks the date on which the accident occurred and it is stated August 26, 1940, did you put that in?

"A. I wrote that in.

"Q. Did you suggest that that would go in?

"A. No.

"Q. Who did?

"A. Mrs. Woodbury.

"Q. Did she state the reason for wanting it to be that date, August 26, 1940?

"A. Well, she asked me if she could begin to draw by turning it in when it happened, and I told her, I don't know, and I presume she put that date because she wanted to get compensation.

"Q. And did you call Mr. Arata's attention to the discrepancy between the time?

"A. Yes, I kept the papers until I went down to work and I asked Mrs. Arata and we both went and asked Mr. Arata how to fill the employer's report in.

* * * *

"Q. The August 26, 1940, written in the body of the claim, is that your writing?

"A. Yes, it is.

"Q. You wrote that in there after she told you the accident occurred in July?

"A. Yes, that was her report, I was supposed to write what she said."

Lillian Arata, wife of Frank B. Arata, in answer to the following questions, made the following answers:

"Q. I notice in the report it states that the claimant claimed it happened in July, claimant didn't report to us until August 26.

* * * *

"Q. This writing in here—'claimant claimed that it happened in July, did not report to us until August 26', that is your writing?

"A. Yes, sir.

"Q. This part 'claimant did not report until August 26', where did you get that information?

"A. From Mrs. Dewey.

"Q. She told you that it was reported on the 26th.

"A. She did.

"Q. The date of the 26 is the same date that she said the accident occurred on?

"A. I don't know anything about the accident, but that is the date she made out the report, but she told her that it really happened in July."

From the above testimony and other evidence appearing in the record, there is no substantial or competent evidence to support the Board's Finding No. V, "That on September 2, 1940, the claimant reported to the bookkeeper of the defendant employer that on August 26 she had been struck on the left breast * * *", but on the contrary, the evidence clearly supports appellant's contention that she reported the accident and injury on or about the 28th day of August, 1940. That it is further clearly established from the entire record that the accident happened on or about the 7th day of July, 1940, and not on September 2, 1940.

It further appears that appellant did not consider the injury that she received as being of a serious nature. When her physician ascertained the seriousness of the condition with which appellant was afflicted, and that appellant was suffering with cancer of the breast, he immediately reported such condition to the manager of the Industrial Accident Board (which was on or about October 4, 1940). Her physi-

cian also made subsequent reports to the Industrial Accident Board.

Respondents contend that appellant failed to comply with the provisions of Sec. 43-1202 and 43-1205, I. C. A., said sections providing that:

"Sec. 43-1202. * * * * No proceedings under this act for compensation for any injury shall be maintained unless a notice of the accident shall have been given to the employer as soon as practicable but not later than sixty days after the happening thereof * * * *."

"Sec. 43-1205.****A notice given under the provisions of Section 43-1202 shall not be held invalid or insufficient by reason of any inaccuracy in stating the time, place, nature or cause of the injury, or otherwise, unless it is shown that the employer was in fact misled to his injury thereby. Want of notice or delay in giving notice shall not be a bar to proceedings under this act if it be shown that the employer, his agent or representative, had knowledge of the accident, or that the employer has not been prejudiced by such delay or want of notice."

█ Keeping in mind the following: The injury to appellant developed gradually; the seriousness and nature of her condition were unknown to her, until some weeks after the accident and injury; when the nature and extent of such condition became known, she reported such knowledge to the State Insurance Fund; and notice of the accident and injury was given to her employer on or about August 26, 1940 (fifty-one days after the accident), it appears that appellant brought herself clearly within the provisions of Secs. 43-1202 and 43-1205, I. C. A. There is no merit in respondents' contention that notice to employer was not given as soon as practicable, within the meaning of Sec. 43-1202, I. C. A.

"The words 'as soon as practicable' should be given a liberal construction, so as not to defeat, without just cause, the compensation to which a meritorious claimant is entitled." (*Bates & Rogers Const. Co. v. Allen* (1919), 183 Ky. 815, 210 S. W. 467; *Hines v. Norwalk Lock Co.* (1924), 100 Conn. 533, 124 Atl. 17; *McGuire v. Phelan-Shirley Co.*, 111 Neb. 609, 197 N. W. 615; *Maryland Casualty Co. v. Robinson* (Va.), 141 S. E. 225; *Clausen v. Minnesota Steel Co.* (Minn.), 242 N. W. 397; *U. S. Fidelity & Guaranty Company v. Industrial Accident Commission* (Cal.), 257 Pac. 895.

We have concluded that there is no sufficient, substantial, competent evidence to support the Board's Finding No. X; namely:

"That claimant did not report the accident to her employer as soon as practical after the accident, and that it has not been shown that the employer was not prejudiced by her failure to report such accident as soon as practical."

Appellant attacks the Board's Finding No. VIII, on the ground and for the reason that there is no sufficient, competent, substantial evidence to support said finding, which is as follows:

"That the condition for which she was operated on October 7 and October 11 * * * * was a cancerous condition which had existed prior to the time she was struck by the falling facer pan * * * * and was neither caused, aggravated, nor accelerated by the said pan striking her left breast as above stated."

A careful examination of the record supports the conclusion, that appellant's cancerous condition, for which she was operated on October 7 and October 11, 1940, existed prior to on or about July 7, 1940, when she was struck by the falling facer pan. It further supports the conclusion, that her cancerous condition was inactive and dormant. To the foregoing extent, the Board's Finding No. VIII is supported.

██ The following portion of the Board's finding, to-wit: That the blow received by appellant when struck by the facer pan on or about July 7, 1940, did not aggravate nor accelerate the cancerous condition of appellant's breast, is not supported by sufficient, substantial and competent evidence. To substantiate the foregoing statement, we call attention to the testimony of expert witnesses called on behalf of the appellant and respondents, heretofore set out. From an analysis of the testimony, the following conclusions are deducible:

First, that prior to on or about the 7th day of July, 1940, appellant was suffering with cancer of the breast, which was inactive and dormant and unknown to her;

Second, that she received a blow upon her left breast, the breast afflicted with cancer, by reason of a facer pan leaving an overhead track and striking her with sufficient force to aggravate and accelerate her cancerous condition, which was the primary and responsible cause necessitating

the radical operation for the removal of her breast on the 11th day of October, 1940; that her disability for work was due to the injury that she received on or about the 7th day of July, 1940, and not otherwise.

The rule is well established in this jurisdiction that injury, resulting partly from accident and partly from a pre-existing disease, is compensable if the accident aggravated or accelerated the ultimate result; and it is immaterial that the claimant would, even if the accident had not occurred, become totally disabled by reason of the disease. (*Young v. Herrington*, 61 Ida. 183, 99 Pac. (2d) 441; *Hanson v. Independent School Dist. 11-J*, 50 Ida. 81, 294 Pac. 513; *Beaver v. Morrison Knudsen Co.*, 55 Ida. 275, 41 Pac. (2d) 605, 97 A.L.R. 1399; In re Larson, 48 Ida. 136, 279 Pac. 1087; *Strouse v. Hercules Min. Co.*, 51 Ida. 7, 1 Pac. (2d) 203; *Scarborough v. Beardmore*, 52 Ida. 180, 12 Pac. (2d) 771.)

From what has been said, it follows that the order of the Board that appellant is not entitled to an award against the respondents, or either of them, and in dismissing her claim for compensation, be and the same is hereby set aside, and the cause remanded, with directions to the Board, to make an award in favor of appellant, fixing her proper compensation. Costs to appellant.

Givens, C.J., concurs. Ailshie, J., dissents.

Holden and Morgan, JJ., concurring specially.

We concur in the foregoing opinion upon the same grounds which prompted us to dissent in *Wade v. Pacific Coast Elevator Co.*, 64 Ida. ......, 129 Pac. (2d) 894. See In re Larson, 48 Ida. 136, 279 Pac. 1087; *Fields v. Buffalo-Idaho Min. Co., Inc.*, 55 Ida. 212, 40 Pac. (2d) 114; *Beaver v. Morrison-Knudsen Co.*, 55 Ida. 275, 41 Pac. (2d) 605, 97 A.L.R. 1399; In re Soran, 57 Ida. 483, 67 Pac. (2d) 906; *Cook v. Winget*, 60 Ida. 561, 94 Pac. (2d) 676; *Hieronymus v. Stone's Food Stores, Inc.*, 60 Ida. 727, 96 Pac. (2d) 435; *Nistad v. Winton Lumber Co.*, 61 Ida. 1, 99 Pac. (2d) 52; *Pinson v. Minidoka Highway District*, 61 Ida. 731, 106 Pac. (2d) 1020; *Aranguena v. Triumph Mining Co.*, 63 Ida. 769, 126 Pac. (2d) 17.)

The foregoing opinions were prepared and agreed upon prior to the death of Morgan, J.